**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Seth Birt, | No. CV-25-01848-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| City of Peoria, *et al.*, | |
| Defendants. | |

At issue is Defendants' Motion to Dismiss Amended Complaint (Doc. 36, MTD), to which *pro se* Plaintiff Seth Birt filed a Response (Doc. 41, Resp.) and Defendants filed a Reply (Doc. 42, Reply). The Court has reviewed the parties' briefs and finds this matter appropriate for decision without oral argument. *See* LRCiv 7.2(f). For the reasons set forth below, the Court dismisses all of Plaintiff's claims without leave to amend except for the procedural due process claim and related conspiracy claim against five individual Defendants.

## I.    BACKGROUND

In his Amended Complaint (Doc. 32, Am. Compl.), Plaintiff brings claims against 1) the City of Peoria, Arizona; 2) city officials Jon Edwards, Henry Darwin, Mike Faust, Bob Lozier, Eric Hannah, and Mark Egger; 3) Hearing Officers Douglas Jorden and Harold Merkow; 4) landscaping company Artistic Land Management; and 5) city attorney Amanda

Sheridan; and he alleges the following facts.[1,2] Plaintiff owns three vacant strips of land (the "Parcels") in Peoria (Am. Compl. ¶ 18) that run along the south side of Deer Valley Road (Am. Compl. ¶ 20). The Parcels are located inside larger tracts owned by the State of Arizona. (Am. Compl. ¶ 21.) Abutting or near the Parcels are a sidewalk and a public right-of-way. (Am. Compl. ¶¶ 42, 65, 76.)

According to the parties, Peoria City Code requires that a landowner maintain his own property, plus a portion of the dedicated City right-of-way adjacent to such property, free from weeds, garbage, debris, and the like. (Am. Compl. ¶¶ 29–32; *see also* MTD at 4:1–14 (reproducing Peoria City Code § 17-3).) Defendants explain that the relevant City nuisance ordinance (hereinafter, the "Ordinance") was recently amended as of April 4, 2025, to make the language clearer. (MTD at 3:24–28.) Before April 4, 2025, which is the period relevant to Plaintiff's claims, § 17-3 of the Ordinance stated in relevant part:

> The following acts, omissions, conditions, and things in or upon any land or structure in the City constitute public nuisances, the existence of which are hereby prohibited and declared to be unlawful: . . .
> (j) It is the responsibility of the owner, lessee or other person in control of any land abutting a sidewalk, alley, or street responsibility to maintain up to the curb line of the street and 50 percent of the alley on which such land abuts in a clean condition in such a manner as to be free from all of the following:
> > (1) Litter, garbage, debris, rubble.
> > . . .

---

[1] For the purpose of resolving Defendants' Motion, the Court attempts to distill Plaintiff's 125-page Amended Complaint here. The Court has spent considerable time piecing together the facts alleged in the Amended Complaint and notes that although Plaintiff indicates certain documents are attached to the pleading, many of them are not. Plaintiff also identifies many footnotes by number, but the substance of those footnotes is not included in the Amended Complaint. The Amended Complaint is also extraordinarily repetitive, with the same factual allegations and claims repeated numerous times over the 125 pages. In this Order, the Court does not attempt to cite every time a factual allegation or legal claim is made in the Amended Complaint, but rather cites only samples of the multitude of repeated statements.

[2] On the Court's Order (Doc. 34), Plaintiff filed a redline version of the Amended Complaint pursuant to LRCiv 15.1(b) (Doc. 35). The redline version contains different paragraph numbering than the Amended Complaint it is supposed to represent. Because the redline version is not the operative Amended Complaint, the Court refers only to the paragraph numbering in the Amended Complaint itself (Doc. 32), but the Court notes that the paragraph numbering goes from ¶ 188 to ¶ 138 on page 62 of the Amended Complaint, so in its citations in this Order, the Court includes page numbering for the paragraphs on pages 62 onward to differentiate those paragraphs from their duplicate counterparts.

(3) Overgrown vegetation, dead trees, brush and weeds.

(4) Other conditions that present a health, fire or safety hazard. . . .

(l) No owner or occupant of a parcel of land shall allow thereon weeds or grass either to attain a height in excess of six inches . . .

(MTD at 4:1–10 (reproducing Peoria City Code §17-3(j),(l)); *see also* Am. Compl. ¶¶ 30, 31.) The "right-of-way" is defined as "land which by deed, conveyance, agreement, easement, dedication, usage or process of law is reserved for or dedicated to the general public for street, highway, alley, public utility, pedestrian, walkway, bikeway, or drainage purposes." (MTD at 4:11–14.)

In 2020, Plaintiff received a call asking if he was interested in selling the Parcels, and he replied he was not. (Am Compl. ¶ 23.) Plaintiff received notice from an appraiser that his property was to be condemned for violation of the Ordinance in "late 2021." (Am. Compl. ¶ 24.) He reached out to city employees Bob Lozier and Mark Egger in December 2022 to fully understand the situation, and he ultimately received an order of abatement notice dated November 17, 2022, at which time he appealed the abatement order. (Am. Compl. ¶¶ 25, 37.) The notice stated that if Plaintiff did not correct the violations by December 8, 2022, the City would remove the offending materials and charge Plaintiff the cost of removal. (Am. Compl. ¶ 34.) To avoid paying a $7,500 fine, Plaintiff cleaned up the Parcels in January 2023 (Am. Comp. ¶¶ 40–41) and the cases were closed on February 15, 2023 (Am. Compl. ¶ 64). During the associated abatement hearing presided over by Hearing Officer Douglas Jorden, Plaintiff asked to confront the witness who filed the Code complaint and cross examine him, but he was informed that he would need a court order to do so. (Am. Compl. ¶¶ 51, 56–57.)

In April 2023, the City received another complaint of "tall weeds around the sidewalk" of Plaintiff's Parcels. (Am. Compl. ¶ 65.) At this point, Plaintiff decided to fight the Code violations, contending that the Ordinance requiring him to maintain "land that is not his" (*i.e.* the right-of-way) is unconstitutional. (Am. Compl. ¶ 71.) The resulting hearing, which occurred in September 2023, ended with a finding that Plaintiff was not responsible for Code violations. (Am. Compl. ¶¶ 78, 81.) After the hearing, the City, acting

through Deputy City Manager Mike Faust, offered to buy Plaintiff's Parcels, but Plaintiff rejected the offer. (Am. Compl. ¶¶ 84–93.) Plaintiff then received another abatement notice in early November 2023, which he again appealed. (Am. Compl. ¶ 95.) A hearing was scheduled in late November 2023, with private attorney Jorden again presiding as Hearing Officer. (Am. Compl. ¶¶ 98, 104.) In this hearing, Eric Hannah and Bob Lozier testified against Plaintiff, and Jorden entered a decision recommending that the City uphold the Code violations. (Am. Compl. at 34–37.) The City Council voted to do so; Jon Edwards was one of the voting Councilmembers. (Am Comp. ¶¶ 119–20.) As a result, the City placed liens on the Parcels for the cost of the abatement and added "a 5 percent surcharge fee[] plus interest." (Am. Compl. ¶¶ 127–28.)

Plaintiff proceeded to appeal "the price of the abatement." (Am. Compl. ¶ 125.) In the appeal, Hearing Officer Harold Merkow upheld the price of abatement. (Am. Compl. ¶¶ 134, 148.) In the course of these proceedings, Plaintiff learned that Jon Edwards was the person who filed the complaints regarding the Parcels. (Am. Compl. ¶¶ 159–62.) In May 2024, Artistic Land Management entered the Parcels to remove weeds without Plaintiff's permission. (Am. Compl. ¶¶ 166–67.) Plaintiff informed city attorney Amanda Sheridan that the City was forcing Plaintiff into "involuntary servitude and slavery which is illegal" (Am. Compl. ¶ 175), but Sheridan disputed this characterization (Am. Compl. ¶ 176).

Because Plaintiff believes the Ordinance is unconstitutional, he has continued to refuse to maintain the Parcels through 2025. (Am. Compl. ¶ 183.) In response to the City's actions to enforce the Ordinance, Plaintiff has now brought suit against the City, the officials involved in his cases, and Artistic Land Management, raising the following claims.

First, he claims that Peoria's City Code violates the Thirteenth Amendment because it forced him into involuntary servitude. (Am. Compl. at 67–71 ¶¶ 157–72.) Second, he alleges that Defendants violated his First Amendment rights because they retaliated against him after he petitioned the government for redress and refused to sell his land. (Am. Compl. at 71–75 ¶¶ 175–96.) Third, Plaintiff claims the City violated (1) the Fourth Amendment by placing liens on his property without a warrant, due process, or just compensation, and

by sending contractors to perform abatement on his property without his permission, and (2) the Fifth Amendment by taking his private property for public use without just compensation because the City forced him to maintain public lands and placed liens on his property. (Am. Compl. at 75–77 ¶¶ 197–203.) Fourth, Plaintiff argues that the fines placed on him were excessive, violating the Eighth Amendment. (Am. Compl. at 77–80 ¶¶ 204–21.) Fifth, he claims the City violated the Fourteenth Amendment by placing liens and entering his property without a warrant, proper process, or adequate justification. (Am. Compl. at 81–83 ¶¶ 222–36.)

Sixth, Plaintiff alleges the City violated his procedural due process rights under the Fourteenth Amendment by "[u]sing non-judicial, administrative hearings staffed by private attorneys with no judicial authority or independence," denying Plaintiff his right to "cross-examine witnesses, challenge evidence, or meaningfully present his case," proceeding with enforcement actions despite Plaintiff "prevailing in City Court," ignoring conflict of interest concerns such as by allowing Jon Edwards to both file code complaints and vote to enforce them, and refusing to justify the fine amount with public record requests. (Am. Compl. at 83–88 ¶¶ 237–62.) Under his seventh claim, Plaintiff alleges that the City instituted discriminatory policies that opened it up to *Monell* liability. (Am. Compl. at 88–95 ¶¶ 264–302.) Eighth, Plaintiff claims that the Defendants conspired together to deprive Plaintiff of his constitutional rights. (Am. Compl. at 95–97 ¶¶ 305–14.) Ninth, Plaintiff alleges the City violated the Fourteenth Amendment by appointing non-judicial hearing officers. (Am. Compl. at 97–98 ¶¶ 316–20.) And tenth, Plaintiff alleges Defendants violated the First and Fourteenth Amendments by denying his right to access the courts and his right to represent himself *pro se*. (Am. Compl. at 99–103 ¶¶ 322–37.)

Defendants have now moved to dismiss Plaintiff's Amended Complaint for failure to state a claim.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule

12(b)(6) for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) the absence of sufficient factual allegations to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When analyzing a complaint for failure to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

"While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation modified). Legal conclusions couched as factual allegations are not entitled to the assumption of truth and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *Iqbal*, 556 U.S. at 679–80. However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Where a plaintiff proceeds *pro se*, the court must construe the pleadings liberally and afford the plaintiff the benefit of the doubt. *Lopez v. Dep't of Health Servs.*, 939 F.2d 881, 882 (9th Cir. 1991) (citing *Karim–Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir.1988)). However, the Federal Rules of Civil Procedure still apply. *See id*. A court may dismiss a complaint that fails to comply with Rule 8. *See Kraft v. Gainey Ranch Cmty. Ass'n*, No. CV-19-05697-PHX-JJT, 2021 WL 535527, at *1 (D. Ariz. Feb. 12,

2021), *aff'd*, No. 21-15653, 2022 WL 2315443 (9th Cir. June 28, 2022) ("Plaintiff subsequently filed a First Amended Complaint that was 105 pages, which the Court struck because it did not comply with Rule 8."). This is permissible even when factual elements of a cause of action are present but scattered throughout the complaint and not organized into a "short and plain statement of the claim." *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 640 (9th Cir. 1988).

"Under Ninth Circuit case law, district courts are only required to grant leave to amend if a complaint can possibly be saved." *Lopez v. Smith*, 203 F.3d 1122, 1129 (9th Cir. 2000). Even *pro se* pleadings are subject to dismissal without leave to amend where amendment would be futile. *Flowers v. First Hawaiian Bank*, 295 F.3d 966, 976 (9th Cir. 2002).

## III. ANALYSIS

As a threshold matter, the Amended Complaint is inconsistent with the directives of Rule 8. While a complaint must contain "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face," *Iqbal*, 556 U.S. at 678 (citation omitted), it should be organized in a "short and plain statement of the claim" where the allegations are "simple, concise, and direct," *Sparling*, 864 F.2d at 640. And, as noted above, while the Court affords pleadings filed by *pro se* plaintiffs the benefit of the doubt, the Federal Rules of Civil Procedure still apply. *Lopez*, 939 F.2d at 882.

Here, the Amended Complaint is 125 pages long and formatted in a way that makes it difficult to understand or follow. For all its length, in many instances the Amended Complaint fails to identify what claim is alleged against which Defendant based on what conduct. Moreover, it unnecessarily contains citations and quotations from caselaw, much of which is irrelevant or does not stand for the proposition Plaintiff states it does.[3]

---

[3] Plaintiff's Response suffers the same problem. For instance, in support of his First Amendment claim, Plaintiff points to *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998), for the proposition that only a person of "ordinary firmness" must be chilled in his statements, not Plaintiff himself. (Resp. at 6:11–14.) The case he cites does not stand for that proposition—in fact, it does not even mention the term "ordinary firmness." Plaintiff does accurately quote statements in other cases, such as *United States v. Kozminski*, 487 U.S. 931 (1988) (Resp. at 5:21–25), but then ignores the context of that case or other parts of the decision that directly contradict his assertions. These case citations

Nevertheless, in the interest of judicial efficiency, the Court will proceed to examine whether Plaintiff's myriad factual allegations in the Amended Complaint plausibly give rise to his legal claims.

### A.    Count 1 – Thirteenth Amendment

Plaintiff brings his constitutional claims under 42 U.S.C. § 1983, which provides that a plaintiff has a right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." However, it is "not itself a source of substantive rights*." Sampson v. Cty. of L.A. by & through L.A. Cty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1018 (9th Cir. 2020). To state a § 1983 claim, Plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States" committed by "a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Plaintiff sues the individual Defendants and Artistic Land Management in both their "individual" and "official" capacities. (Am. Compl. at 3–8.) "Within the meaning of § 1983, states and state agencies are not considered "persons" who can be sued for damages. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989). Generally, only individual state officials or employees, sued in their personal capacity, qualify as "persons" within the meaning of § 1983. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). Courts treat official-capacity claims for money damages as claims against the State and barred by the Eleventh Amendment. *Will*, 491 U.S. at 70–71; *Spears v. Ariz. Bd. of Regents*, 372 F. Supp. 3d 893, 923 (D. Ariz. 2019). An exception to these principles is set forth in *Monell v. New York City Department of Social Services*, 436 U.S. 658, 701 (1978), which provides that municipal entities are "persons" that can be sued for damages under § 1983 to the extent the constitutional deprivation Plaintiff complains of arose out of an official policy or custom of the municipal entity.

For a government actor to be liable in his personal capacity under a § 1983 claim, "there must be a showing of personal participation in the alleged rights deprivation[.]" thus do not provide legal support for Plaintiff's contentions.

*Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Additionally, "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sampson*, 974 F.3d at 1018. A qualified immunity analysis in a § 1983 action involves two steps: (1) whether the official's conduct violated a constitutional right; and (2) if so, whether the constitutional right was "clearly established" at the time of the alleged violation, such that a reasonable official would have known his conduct was unlawful under the circumstances. *Hopkins v. Bonvicino*, 573 F.3d 752, 762 (9th Cir. 2009). "For a right to be considered 'clearly established,' it is generally important that the precedential case law be factually similar to the case at issue." *Denby v. City of Casa Grande*, 668 F. Supp. 3d 855, 870 (D. Ariz. 2023). To determine whether a clearly established right exists, the focus is "on whether the officer had fair notice that her conduct was unlawful." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). The Supreme Court has said, "'we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation,'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), because "qualified immunity is 'an immunity from suit rather than a mere defense to liability,'" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Here, Plaintiff first claims that the Ordinance, which requires him to maintain both his own property and the right-of-way up to the curb line of the street, is unconstitutional because the City has used it to force him into involuntary servitude prohibited by the Thirteenth Amendment.[4] Specifically, Plaintiff alleges "Defendants City of Peoria,

---

[4] Plaintiff also alleges that the City's Ordinance violates the provision in 42 U.S.C. § 1994 abolishing debt-peonage (Am. Compl. at 67), but Plaintiff's factual allegations do not give rise to such a claim. Peonage is a "condition of compulsory service, based upon indebtedness of the peon to the master." *United States v. Reynolds*, 235 U.S. 133, 144 (1914). No factual allegations in the Amended Complaint lead to the plausible inference that the Ordinance forced Plaintiff to work for the purpose of paying off a debt to Defendants; if anything, the "debt" in the form of City fines arose from Plaintiff's failure to perform work required by the Ordinance.

1   Amanda Sheridan, Bob Lozier, Mark Egger, Eric Hannah, Mike Faust, Jon Edwards, and

2   others acting under color of state law knowingly and repeatedly compelled Plaintiff to

3   perform labor and services—specifically the physical clearing and maintenance of

4   vegetation, trash, and debris—on public land and right-or-way not owned by Plaintiff."

5   (Am. Compl. at 67 ¶ 158.)

6        This allegation exemplifies some of the lack of clarity in Plaintiff's claims. The

7   thrust of Plaintiff's Thirteenth Amendment claim is that the Ordinance is unconstitutional,

8   which claim can be brought under *Monell* against the City. To the extent Plaintiff alleges

9   that the named individuals are liable for good faith enactment of an unconstitutional

10  ordinance, the individual officials are immune from such claims. *See Trevino By and*

11  *Through Cruz v. Gates*, 23 F.3d 1480, 1482 (9th Cir. 1994) ("The absolute immunity of

12  legislators, in their legislative functions, . . . now is well settled," and "[t]his absolute

13  immunity extends to local legislators" (internal citations and quotations omitted)). And, as

14  further example, no allegations in the Amended Complaint lead to the plausible inference

15  that Defendant Artistic Land Management is somehow liable for enacting an allegedly

16  unconstitutional City Ordinance. Plaintiff thus fails to state a Thirteenth Amendment claim

17  against any of the individual Defendants or Artistic Land Management.

18       In support of his claim that the Ordinance is violative of the Thirteenth Amendment,

19  Plaintiff cites *Kozminski*, where the Supreme Court held that involuntary servitude

20  necessarily requires "a condition of servitude in which the victim is forced to work for the

21  defendant by the use or threat of physical restraint or physical injury, or by the use or threat

22  of coercion through law or the legal process." 487 U.S. at 952. He argues that the fines and

23  liens levied against him under the Ordinance to induce him to maintain his own property

24  and the public right-of-way constitute coercion through law or the legal process sufficient

25  for a claim under the Thirteenth Amendment.

26       A condition may be necessary for a claim without being sufficient. In *Kozminski*,

27  the Supreme Court explained that

28

not all situations in which labor is compelled by physical coercion or force of law violate the Thirteenth Amendment. By its terms the Amendment excludes involuntary servitude imposed as legal punishment for a crime. Similarly, the Court has recognized that the prohibition against involuntary servitude does not prevent the State or Federal Governments from compelling their citizens, by threat of criminal sanction, to perform certain civic duties.

*Id.* at 943–44 (citations omitted). Plaintiff tries to distinguish *Kozminski* here by arguing that the civic duties the Supreme Court is alluding to, such as jury duty and military service, are compensated, which renders them constitutional. (Resp. at 6:2–5.)

The Court disagrees. To begin with, Plaintiff ignores other forms of civil service required by governments in certain contexts that are uncompensated and yet have been found not to be involuntary servitude, such as a civil requirement to work to maintain roads, *Butler v. Perry*, 240 U.S. 328 (1916), or prepare an income tax return. Governments, including cities and towns, may enact ordinances under their police power requiring citizens to perform certain functions without compensation as part of living in a civil society. *See id.* at 330 ("[U]nless restrained by some constitutional limitation, a state has inherent power to require every able-bodied man within its jurisdiction to labor for a reasonable time on public roads near his residence without direct compensation."). As a result, under the existing caselaw, Plaintiff's argument that the City's Ordinance compelling labor without compensation is unconstitutional fails. Indeed, such laws have been accepted "[f]rom [c]olonial days to the present time." *Id.* at 331.

Additionally, a key element for finding involuntary servitude is whether the person being compelled to do the work had any form of choice. For instance, in *Swain v. Bixby Village Golf Course Inc.*, when a company "voluntarily entered a contract to purchase the Lakes Golf Course property, with full knowledge of the risks involved in the transaction," the Arizona Supreme Court did not find involuntary servitude by way of a covenant compelling the purchasing company to operate the golf course. 450 P.3d 270, 279 (Ariz. 2019). According to his own allegations, Plaintiff voluntarily purchased the Parcels (Am. Compl. ¶ 22) when the Ordinance was in effect, and he continues to own them even after

being informed of his duty to maintain the properties and adjacent land pursuant to the City Code under threat of financial penalty. Because Plaintiff had the ability to exercise choice, application of the Ordinance was not a violation of the Thirteenth Amendment.

As Defendants argue and caselaw shows, laws compelling civil service without compensation are not inherently unconstitutional, *Kozminski*, 487 U.S. at 943, and Plaintiff alleges no facts leading to the plausible inference that the Ordinance is not a legitimate exercise of the City's police power. The Court will thus dismiss Plaintiff's Thirteenth Amendment claim, and because the Court does not find Plaintiff can cure the defects in this claim by amendment, the Court will dismiss Count 1 with prejudice.

### B.    Counts 2 and 10 – First Amendment

Plaintiff next alleges Defendants violated the First Amendment in his second and tenth claims, which the Court will examine together. In Count 2, Plaintiff alleges that Defendants engaged in retaliation violative of the First Amendment through such acts as initiating abatement actions and filing liens on Plaintiff's private property. (Am. Compl. at 72 ¶ 183.) He alleges these acts occurred after he refused to sell his property to the City, criticized the City's conduct, appealed the Code violations, filed a public records request, and brought a lawsuit in federal court. (Am. Compl. at 71–72 ¶¶ 175, 180–81, 190.) In Count 10, Plaintiff claims Defendants treated his legal filings unfairly and without respect by denying his constitutional claims simply because he appeared *pro se*. (Am. Compl. at 101 ¶ 328). This "created a chilling effect on Plaintiff's access to the courts, retaliated against his protected right to petition, and denied him fair opportunity to assert constitutional defenses and obtain redress." (Am. Compl. at 101 ¶ 327.) Based on these allegations, Plaintiff brings First Amendment claims under § 1983.

#### 1.    Count 2

With regard to Count 2, "[a]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quotations and citations omitted). "To recover under § 1983 for such retaliation, a plaintiff must prove: (1) he

engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (citations omitted). Under the first element, "in determining 'whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play,' the Supreme Court asks 'whether an intent to convey a *particularized message* was present, and whether the *likelihood was great* that the message would be understood by those who viewed it.'" *Young v. N.Y.C. Transit Auth.*, 903 F.2d 146, 153 (2d Cir. 1990) (quoting *Spence v. Washington*, 418 U.S. 405, 410–11 (1974)). And under the third element requiring a showing of causation, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured— the motive must *cause* the injury. Specifically, it must be a "but-for" cause, meaning the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 587 U.S. at 398–99 (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (recognizing that although it "may be dishonorable to act with an unconstitutional motive," an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway")).

As for the first *prima facie* element, Plaintiff has raised the plausible inference that he engaged in protected activity under the First Amendment by way of expressive conduct, *see Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 722 (9th Cir. 2022), by alleging that he complained to the City that the Ordinance was unconstitutional, *see Dahlia v. Rodriguez*, 735 F.3d 1060, 1077–78 (9th Cir. 2013), and by appealing the code violations and bringing this lawsuit, *see Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).[5] And the alleged conduct of City officials in initiating abatement actions and

---

[5] No factual allegations in the Amended Complaint plausibly lead to the inference that Plaintiff's refusal to sell property to the City was expressive conduct sufficient to bring the First Amendment into play, nor does Plaintiff cite any legal authority supporting that proposition.

filing liens on Plaintiff's property could be sufficient to chill a person of ordinary firmness, fulfilling element two, because they could "threaten[] or cause[] pecuniary harm." *Riley's Am. Heritage Farms*, 32 F.4th at 723. However, Plaintiff has not alleged any non-conclusory facts suggesting that there was a sufficient causal relationship between the constitutionally protected activities and the adverse actions; as a result, his First Amendment retaliation claim does not survive Defendants' Rule 12(b)(6) motion.

Specifically, regarding the first abatement action, according to Plaintiff's allegations, Defendants began the action before Plaintiff began petitioning and criticizing the Ordinance and the conduct of the City's officials. The first letter of condemnation was sent on November 18, 2021, and Plaintiff fixed the code violations. (Am. Compl. ¶¶ 26, 42.) As the first abatement action occurred before Plaintiff began engaging in constitutionally protected activity, and effect cannot precede cause, this action could not have been an attempt to chill Plaintiff's First Amendment rights.

City officials initiated the second abatement action in April 2023.[6] (Am. Compl. ¶ 65.) But Plaintiff has not alleged sufficient facts suggesting any Defendants enforced the Ordinance against him because of his complaints or legal actions. For example, Plaintiff does not allege that he did not violate the Ordinance and Defendants' enforcement of it against him was frivolous; indeed, Plaintiff essentially concedes he did not meet the requirements of the Ordinance and argues rather that enforcement of the Ordinance is unconstitutional. *See, e.g.*, *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) ("Under this Court's precedents, a plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an "adverse action" in response to his speech that "would not have been taken absent the retaliatory motive." (quoting *Nieves*, 587 U.S. at 399)). Indeed, in *Nieves*, the Supreme Court held that the plaintiff's claim that his arrest was "retaliatory" failed because police had probable cause to arrest him. 587 U.S at 404, 408 (stating "probable cause should generally defeat a retaliatory arrest claim" except "where officers have probable cause to make arrests, but typically

_____

[6] City officials' placement of liens on Plaintiff's property was a result of its abatement action, so the Court analyzes the placement of liens together with the abatement action.

exercise their discretion not to do so"). By analogy, because Plaintiff does not allege non-conclusory facts showing City officials had no basis to initiate the abatement actions—that is, that the Parcels and adjacent right-of-way did *not* have weeds or debris on them—or that they ordinarily do not enforce the Ordinance but did in his case, Plaintiff has not met the but-for causation element of the First Amendment retaliation test. Finding that Plaintiff cannot cure this defect by amending his pleading, the Court will dismiss Count 2 without leave to amend.

### 2.    Count 10

In Count 10, Plaintiff brings a § 1983 claim under the First Amendment for the Defendant officials' alleged disregard of his arguments due to his *pro se* status.[7] (Am. Compl. at 99–103, ¶¶ 323–38.) Plaintiff's First Amendment claim requires he demonstrate the individual Defendants' actions deterred or chilled his speech and that such deterrence or chilling was a "substantial or motivating factor" in Defendants' conduct.[8] *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).

Specifically, Plaintiff alleges that Defendants refused to concede Plaintiff's constitutional arguments in the proceedings related to the abatement actions, disagreed with his use of case law, rejected his objections, and continued to enforce the Ordinance simply because of Plaintiff's *pro se* status. (Am. Compl. at 100 ¶ 325.) This pattern of conduct "chilled his ability to challenge unlawful actions." (Am. Compl. at 101 ¶ 329.) This claim by its very nature asks the Court to review the decisions of the City's adjudicators, which the Court has no jurisdiction to do. In any event, Plaintiff has alleged no facts in his Amended Complaint suggesting the reason Defendants rejected Plaintiff's arguments was simply because Plaintiff appeared *pro se*, rather than because the arguments lacked legal support or merit. Through the City's adjudication process, Plaintiff was given

---

[7] Plaintiff also brings this claim under the Fourteenth Amendment Due Process Clause, and in this particular instance, the Court's analysis of the claim is the same under either Amendment.

[8] To the extent he has brought it (Am. Compl. at 88 ¶ 260), Plaintiff's Equal Protection claim will "rise and fall with the First Amendment claim." *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012).

the opportunity to be heard and to appeal decisions with which he did not agree. The Court can thus find no First (or Fourteenth) Amendment violation in the City officials' adjudication process and will dismiss Count 10 without leave to amend.

### C.    Counts 3 and 6.1 – Fourth Amendment

Plaintiff alleges both Fourth and Fifth Amendment violations in his third claim. As those are two different claims, the Court will examine them separately. Moreover, Plaintiff also alleges a Fourth Amendment violation in a portion of his sixth claim, which the Court will examine here.[9] In sum, Plaintiff claims that Defendants violated the Fourth Amendment by placing liens on his property and sending Artistic Land Management—a contracted landscaping company—to clean up his property. (Am. Compl. at 75–76 ¶¶ 197–201; 81–83 ¶¶ 224–36.) Plaintiff characterizes the actions of City officials and Artistic Land Management as "unreasonable searches and seizures."

Under the Fourth Amendment, a seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 499 U.S. 109, 113 (1984). The seizure is violative of the Fourth Amendment if it is not objectively reasonable. *Soldal v. Cook County, Illinois*, 506 U.S. 56, 61–62, 72 (1992).

Plaintiff cites *Soldal* to support his characterization of the City officials' acts (Resp. at 6–7), but that case is distinguishable. In *Soldal*, deputy sheriffs knew that there was no eviction order and that a trailer park manager's actions were unlawful, but despite this knowledge the deputies refused to take Mr. Soldal's complaint for criminal trespass or otherwise interfere with his eviction. *Id.* at 58. During the illegal eviction—which unlike the City officials' conduct here was clearly illegal because the manager did not wait for a judgment in the trailer park's favor before moving forward with the eviction—trailer park employees forcibly "proceeded to wrench the sewer and water connections off the side of the trailer home, disconnect the phone, tear off the trailer's canopy and skirting, and hook the home to a tractor" to move it to another location. *Id.* Later, a state judge ruled the

---

[9] Plaintiff labels two of his claims "Count 6," so the Court renames them Count 6.1 (Am. Compl. at 81–84 ¶¶ 222–41) and Count 6.2 (Am. Compl. at 84–88 ¶¶ 243–62).

eviction was unauthorized and ordered the trailer to be returned to the lot, but the trailer suffered significant damage in the towing process. *Id.* at 59. The Supreme Court held that the seizure and removal of the trailer home without an eviction order raised a Fourth Amendment claim. *Id.* at 72.

By contrast, in the present case, Hearing Officers and the City Council reached final decisions that Plaintiff had violated the Ordinance requiring him to control weeds on the Parcels. In the process, Plaintiff received notice of his Code violations, was informed that liens would be placed on his property if he did not fix the violations, and had a chance to appeal, which he took. In any event, a lien is not considered a "taking" or "seizure" of property, as it is "merely a security interest and does not involve the immediate seizure of property." *United States v. Barbier*, 896 F.2d 377, 379 (9th Cir. 1990). Likewise, Plaintiff was informed that a contracted landscape company would enter and clean up the Parcels as a result of his failure to comply with the Ordinance, and except for a temporary presence on the Parcels, Artistic Land Management did not seize the property; they simply cut weeds on the property to ground level to comply with the Ordinance. Even if the liens or Artistic Land Management's actions could be considered a seizure under the Fourth Amendment, these actions were not objectively unreasonable in light of the final decisions reached after an adjudication regarding Plaintiff's violation of the Ordinance. For all these reasons, Plaintiff's Fourth Amendment claim fails, and the Court will dismiss it without leave to amend.

### D.    Count 3 – Fifth Amendment

In Count 3, Plaintiff also claims the placement of liens on his property constitutes a "taking" under the Takings Clause of the Fifth Amendment. (Am. Compl. at 76–77 ¶ 202.) That clause, applicable to the States through the Fourteenth Amendment, provides "nor shall private property be taken for public use, without just compensation." To state a takings claim, a plaintiff must allege: (1) the plaintiff owns "private property"; (2) the private property was "taken" for "public use"; and (3) the taking entity did not pay "just compensation" for the property. *Zeyen v. Bonneville Joint Dist., No. 93*, 114 F.4th 1129,

1139 (9th Cir. 2024).

Plaintiff has not alleged sufficient facts to plausibly demonstrate a Takings Clause violation. City officials have not "taken" Plaintiff's property by, for example, transferring title or preventing him from entering or using his land. Instead, they have placed liens on the property associated with Plaintiff's failure to comply with the Ordinance, and those liens do not act to take Plaintiff's property for public use, as required to bring a Takings Clause claim. *See Barbier*, 896 F.2d at 379 (stating "[a] lien is merely a security interest and does not involve the immediate seizure of property," but rather "enables the [property owner] to maintain possession of protected property while allowing the government to preserve its claim should the status of property later change"). Moreover, to the extent Plaintiff contends the lien affects the value of his property, the Supreme Court has made clear that the "government may, consistent with the Takings Clause, affect property values by regulation without incurring an obligation to compensate—a reality we nowadays acknowledge explicitly with respect to the full scope of the State's police power." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1022–23 (1992). In other words, "the government does not take a property interest when it merely asserts a 'pre-existing limitation upon the land owner's title'… for example, the government owes a landowner no compensation for requiring him to abate a nuisance on his property, because he never had a right to engage in the nuisance in the first place." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021) (citing *Lucas*, 505 U.S. at 1028–30). For these reasons, Plaintiff's Fifth Amendment claim fails, and the Court will dismiss Count 3 without leave to amend.

### E.    Counts 4 and 5 – Eighth Amendment

Plaintiff alleges Eighth Amendment violations in both Counts 4 and 5 (Am. Compl. at 77–80 ¶¶ 204–21), and because Plaintiff alleges the same cause of action based on the same facts in both claims, the Court will examine them together. The Eighth Amendment, applicable to the States through the Fourteenth Amendment, provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." As a basis for his Eighth Amendment claim, Plaintiff claims City officials "imposed

excessive fines, liens, and penalties" for his Ordinance violations. (Am. Compl. at 79 ¶ 217.)

Courts review Eighth Amendment Excessive Fines claims in two steps: first, whether the "Excessive Fines clause applies at all," and second, if the clause applies, whether the fine is unconstitutionally excessive. *Torres v. City of N.Y. through N.Y. City Police Dep't*, 590 F. Supp. 3d 610, 627 (S.D.N.Y. 2022). Under the first step, the Excessive Fines clause of the Eighth Amendment only applies where the fine at issue can be characterized as punitive. *Pimentel v. City of L.A.*, 115 F.4th 1062, 1067 (9th Cir. 2024) ("Only punitive fines fall within the Clause's scope; purely remedial sanctions are not subject to Eighth Amendment scrutiny."). In other words, remedial fines, sanctions, or liens are not subject to the Eighth Amendment because they are not imposed as punishment.

Plaintiff has alleged no facts that the fines and liens imposed against him were punitive. The orders Plaintiff included in his Amended Complaint explicitly tie the fines to the cost of abating the nuisance, along with a five percent surcharge to cover the City's incidental costs. (*E.g.*, Am. Compl. ¶¶ 32, 149.) Separately, Plaintiff alleges that the City Council decision authorized the landscaping company to clean up the Parcels and "charge [Plaintiff] the fees for that work and put a lien on [his] properties for the costs plus a 5 percent surcharge and the liens collect interest every month they ar[e]n't paid" (Am. Compl. ¶ 121). On their face, these allegations show that the fines were remedial, not punitive, making the Eighth Amendment inapplicable. Accordingly, Plaintiff fails to state an Eighth Amendment claim for excessive fines as a matter of law, and the Court will dismiss Counts 4 and 5 without leave to amend.

## F.    Counts 6.1, 6.2, and 9 – Fourteenth Amendment

In a portion of Count 6.1 as well as Count 6.2, Plaintiff brings a procedural due process claim under the Fourteenth Amendment, alleging Defendants "deprived Plaintiff of a fair hearing[] and neutral decision makers" in the enforcement of the Ordinance. (Am. Compl. at 83 ¶ 237.) Specifically, he alleges "[t]he hearings lacked adversarial process and impartiality" because he "was not permitted to cross-examine witnesses, contest costs

before liens were recorded, or seek judicial review of administrative decisions." (Am. Compl. at 83–84 ¶ 239.) Moreover, he alleges his due process rights were violated because the decision makers enforcing the Ordinance were biased on account of their "financial interest in the outcome," that is, their desire to buy Plaintiff's Parcels, and City Councilmember Jon Edwards filed complaints initiating enforcement actions against Plaintiff and then "later voted on abatement outcomes." (Am. Compl. at 83–84 ¶¶ 238, 240.) In Count 9, Plaintiff repeats his claim that his procedural due process rights were violated by way of the alleged lack of independence and neutrality of the Hearing Officers adjudicating the abatement actions, Douglas Jorden and Harold Merkow. (Am. Compl. at 97–98 ¶¶ 316–20; *see also* Am. Compl at 83 ¶ 238.)

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976). Such a claim requires a plaintiff to show (1) the existence of a property or liberty interest protected by the Constitution, (2) a deprivation of the interest by government action, and (3) a lack of due process. *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008); *see also Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) (stating that, in a § 1983 action for a procedural due process violation, the injury giving rise to the claim is complete when (1) "a liberty or property interest . . . has been interfered with by the State;" and (2) "the procedures attendant upon that deprivation were constitutionally" insufficient).

The Supreme Court has held that there is no strict formula for the due process required in an administrative proceeding. *Eldridge*, 424 U.S. at 348 ("[The] differences in the origin and function of administrative agencies preclude wholesale transplantation of the rules of procedure, trial and review which have evolved from the history and experience of courts.") (citation omitted); *see also Franceschi v. Yee*, 887 F.3d 927, 935 (9th Cir. 2018) ("It is well-established that because due process is a flexible concept, precisely what procedures the Due Process Clause requires in any given case is a function of

context."(cleaned up)). Instead, the "essence of due process is the requirement that a person in jeopardy of serious loss [be given] *notice* of the case against him and *opportunity* to meet it." *Eldridge*, 424 U.S. at 348 (emphasis added) (citation omitted). "All that is necessary is that the procedure be tailored in light of the governmental and private interests that are involved, to [e]nsure that appellee is given a meaningful opportunity to present his case." *People ex rel. Babbitt v. Herndon*, 119 Ariz. 454, 457 (1978).

The appropriate remedy for deprivation of a property interest without due process "is to order the process that was due and any attendant damages which directly resulted from the failure to give the proper procedure." *Brady v. Gebbie*, 859 F.2d 1543, 1551 (9th Cir. 1988); *see also Burton v. Cascade Sch. Dist.*, 512 F.2d 850, 853 (9th Cir. 1975) (noting courts decide the appropriate remedy by a careful weighing of all the facts and circumstances)

### 1. Ordinance Violations

The City has a process to address Code violations, which are civil in nature. Pursuant to the City Code:

**Sec. 17-57. Notice of violation; rubbish, trash, weeds, filth, debris, and dilapidated structures.**
Upon reasonable belief that a violation of this chapter has occurred and rubbish, trash, weeds, or other accumulation of filth, debris, or dilapidated structures, including but not limited to accumulation of stagnant waters in swimming pools, spas and hot tubs constitute a hazard to public health and safety from buildings, grounds, lots, contiguous sidewalks, streets, and alleys, the city shall:
(a) Provide written notice that shall be served upon the owner, occupant or lessee by United States mail, or in person at their last known address, or at the address on file in the Maricopa County Treasurer's Office to which the most recent tax bill was mailed. If the owner does not reside upon the property, a copy of the notice shall be mailed to the owner by first class United States Mail to the owner's last known address, or may be served by any other means reasonably calculated to provide the owner with notice.
(b) The notice shall provide that the owner, occupant or lessee shall have thirty (30) days to remove any rubbish, trash, weeds, filth, debris, litter or dilapidated structures, including but not limited to accumulation of stagnant waters in swimming pools, spas and hot tubs upon the property or adjacent

- 21 -

sidewalks, streets and alleys and the estimated cost to the City for the removal.

(c) The notice shall provide that the owner, occupant or lessee shall have ten (10) days to appeal in writing the issuance of the notice to the City Council. The date of mailing of the appeal shall be the date of filing. All appeals shall specify the grounds for appeal. The appeal shall be filed with the City Clerk, together with the appeal fee provided in this code, failure to pay the required fee shall result in the appeal not being filed.

(MTD at 13:23–14:10 (citing Peoria City Code § 17-57).)

Plaintiff alleges he received notice of his violations in accordance with the Ordinance. (*See* Am. Compl. ¶ 65.) Plaintiff also states that he had an opportunity to present his case, and he actually presented his case. (*E.g.*, Am. Compl. ¶¶ 101, 104, 118, 129.) Plaintiff had a hearing for each violation in which he was able to give evidence to support his contention that he should not have to maintain the right-of-way. (Am. Compl. ¶¶ 101, 104, 118, 129.) As he asserts in the Amended Complaint, he prevailed in some of those cases, which were then dismissed, and he lost others. Simply because Plaintiff lost certain cases does not by itself mean the adjudicators were biased, as Plaintiff claims. Moreover, decisions of the Hearing Officers were reviewed by the City Council. (*E.g.*, Am. Compl. ¶¶ 119–20.) On their face, these facts suggest that Plaintiff had sufficient notice and the meaningful opportunity to present his case.

Plaintiff also claims that City officials assessed and recorded liens without his consent. (*E.g.*, Am. Compl. at 83–84 ¶ 239.) Liens, by definition, are not an instrument to which the opposing party consents. In the Amended Complaint, Plaintiff alleges that he was given the opportunity to bring his land and the right-of-way up to Code before the abatement was ordered and liens placed, but he chose not to because he believed the Ordinance was unconstitutional. (Am. Compl. ¶¶ 176–79.) This also suggests that he received due process. *See Yee*, 887 F.3d at 936 (holding opportunity to cure defect weighed against finding a violation of due process).

But two of Plaintiff's allegations plausibly raise a procedural due process claim. First, Plaintiff claims that City officials did not act in a disinterested and impartial way in deciding to bring the Ordinance enforcement actions against him—and ultimately finding

him out of compliance and recording liens to encumber the Parcels—because the officials had long expressed an interest in buying the Parcels. (*E.g.*, Am. Compl. at 84 ¶ 240.) While it is not entirely clear from the Amended Complaint that those in a decision-making role with regard to the enforcement actions were sufficiently related to those attempting to purchase the Parcels from Plaintiff, the allegations are adequate at this stage of the litigation to raise the plausible inference of a conflict between the officials' partisan interests—purchasing Plaintiff's Parcels—and their obligations as quasi-judicial officers to be unbiased and disinterested under the Due Process Clause. *See Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57, 59–62 (1972) (noting that a procedural due process violation can arise even if unfairness in the initial adjudication process can be corrected on appeal).

In stating the procedural due process claims themselves in the Amended Complaint, Plaintiff makes most of his allegations against "the City" and "Defendants" without more detail as to who was responsible for what conduct. In other portions of the Amended Complaint, Plaintiff alleges Mike Faust contacted him repeatedly to express the City's great interest in buying the Parcels and to ask whether Plaintiff would sell the Parcels to the City, and Faust also participated in bringing and resolving the Code enforcement actions. (*E.g.*, Am. Compl. ¶¶ 89, 92–93, 183.) Plaintiff also alleges Bob Lozier, Mark Egger, and Eric Hannah, as Code compliance officials for the City, helped initiate the enforcement actions after Plaintiff refused to sell the Parcels, and they also participated in their resolution. (*E.g.*, Am. Compl. ¶¶ 58, 60, 67, 71, 183.) The allegations as a whole raise the plausible inference that these Defendants did not act with the requisite unbiased and disinterested conduct in bringing and resolving the abatement actions against Plaintiff, and Plaintiff has thus stated a procedural due process claim against them under § 1983.[10] *See Armstrong v. Reynolds*, 22 F.4th 1058, 1070 (9th Cir. 2022) (stating a plaintiff may bring a § 1983 claim against a state government official in his personal capacity who subjects plaintiff to the deprivation of a procedural due process right); *Johnson v. Duffy*, 588 F.2d

---

[10] Defendants do not attempt to show that no reasonable official would have known the alleged conduct was unlawful under the circumstances, as required for qualified immunity to apply, and the Court thus does not so find.

740, 743–44 (9th Cir. 1978) (stating § 1983 liability may arise against a state government actor "not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury"). By contrast, Plaintiff's allegations are not sufficient to bring such a claim against Henry Darwin simply on the basis of his role as City Manager, or Amanda Sheridan simply on the basis of her role as City attorney and in defending the present lawsuit, or Artistic Land Management simply on the basis of its role as the contractor that ameliorated the Parcels. The Court will dismiss the procedural due process claims against these three Defendants without leave to amend.

Second, Plaintiff claims that an inherent conflict arose when City Councilmember Jon Edwards brought the complaints under the Ordinance against Plaintiff and then, constructively as an appellate adjudicator, voted to uphold the decisions of the Hearing Officers finding Plaintiff violated the Ordinance. (*E.g.*, Am. Compl. at 83 ¶ 238.) While the fact that one person acts in both an investigative/prosecutorial role and then in an adjudicative function does not automatically raise the specter of partiality, *see, e.g.*, *Rouse v. Scottsdale Unified Sch. Dist. No. 48*, 752 P.2d 22, 24–26 (Ariz. Ct. App. 1987) (citing *Withrow v. Larkin*, 421 U.S. 35, 51 (1975)), it can when the person has a financial stake in the ultimate decision, *see id.* at 25 (citing *Ward*, 409 U.S. at 57), as Plaintiff alleges Edwards did by way of the City's interest in buying Plaintiff's Parcels. Plaintiff thus states a procedural due process claim against Edwards as well.

## 2.    Hearing Officers

Plaintiff also argues that he did not receive adequate due process because the Code violation claims against him were judged by "biased contract officers" who lacked independence and neutrality because they were hired by the City. (Am. Compl. at 81 ¶ 222; 97–98 ¶ 318.) Yet he offers no facts in support of the idea that they were biased, other than that they were paid by the City and sometimes ruled in its favor. His suit against them cannot be sustained, because he alleges no non-conclusory facts beyond that they are

Hearing Officers hired by the City to execute a judicial function. As a result, they enjoy absolute judicial immunity.

The City of Peoria, like many cities in Arizona, utilizes Hearing Officers to act as judicial officers in ruling on certain civil matters such as civil code violations. This is authorized by state statute, A.R.S. § 9-500.21, which states:

> A city or town that classifies ordinance violations as civil offenses shall establish procedures to hear and determine these violations that may include:
> 1. Filing of a complaint before a hearing officer. The city or town magistrate may serve as a hearing officer or the city or town may appoint a separate hearing officer.
> 2. Timely notice of the citation to the violator. If the city or town is unable to personally serve the notice, the notice may be served in the same manner prescribed for alternative methods of service by the Arizona rules of civil procedure or by certified or registered mail, return receipt requested.
> 3. Procedures for the hearing, record on appeal, default by a defendant and rules of evidence that generally comply with those for civil traffic offenses.
> 4. Imposition of a civil penalty. At the conclusion of the hearing, the hearing officer shall determine whether a violation exists and, if so, may impose civil penalties of up to the maximum amount specified in section 9-240 for ordinance violations for each day a violation exists beyond the initial notice constituting a separate offense. The hearing officer may also order abatement of the violation pursuant to section 9-499.
> 5. A provision that if the violator does not comply with a civil enforcement action, the city or town may file a criminal charge. A civil enforcement action is not a prerequisite to the filing of a criminal charge.
> 6. Judicial review of the final decisions of the hearing officer pursuant to section 12-124.

Here, Peoria's City Code, under § 21-132, allows that "[p]ursuant to A.R.S. § 9-462.08 . . . the City has the authority to establish administrative hearing officer(s) and delegate to the hearing officer(s) the authority to conduct hearings." (Reply at 4:1–14 (citing City Code).) As a result, based on Plaintiff's allegations, the Hearing Officers in this case, Doug Jorden and Harold Merkow, were validly executing their assigned function.

Plaintiff claims that because the Hearing Officers are under contract with the City, they are biased. (Am. Comp. at 83 ¶ 238.) But being paid by the City to act as Hearing

Officers is by itself not sufficient to suggest they are "without the safeguards, independence or neutrality require" (Resp. at 8:12). For example, every federal judge is also paid by the federal government, but that does not mean the judges are biased when judging cases involving the federal government.

As a general principle, judges are entitled to absolute judicial immunity from suits for damages brought based on a "judicial act," such as those acts "involved in resolving disputes between parties." *Forrester v. White*, 484 U.S. 219, 225–27 (1988); *see also Stump v. Sparkman*, 435 U.S. 349 (1978) (holding judge had judicial immunity even though he acted informally). As the Supreme Court has noted, "[i]f a state court errs in its rulings, too, the traditional remedy has been some form of appeal." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021). Likewise, Arizona caselaw provides that "[j]udges . . . are not liable in a civil action for damages for their judicial acts, even when such acts are in excess of their jurisdiction or are alleged to have been done maliciously or corruptly." *Acevedo v. Pima Cnty. Adult Prob. Dep't*, 690 P.2d 38, 40 (Ariz. 1984). This protection exists "to assure that judges will exercise their functions with independence and without fear of consequences." *Id.* The doctrine of judicial immunity is not limited to sitting judges. *Burk v. State of Arizona*, 156 P.3d 423, 426 (Ariz. Ct. App. 2007). "Court officers, employees, and agents who perform functions 'intimately related to' or that are 'an integral part of the judicial process,' are also protected by the doctrine." *Id.* (quoting *Acevedo*, 690 P.2d at 40–41).

Furthermore, pursuant to A.R.S. § 12-820.01(A)(1), a public entity is not liable for acts and omissions of its employees constituting the exercise of either a judicial or legislative function. Defendants Harold Merkow and Doug Jorden were the Hearing Officers assigned to hear Plaintiff's Abatement Notice appeals, and their assignment as Hearing Officers was to exercise their judgment regarding the Abatement appeals and make a recommendation to City Council whether to uphold or reverse the Abatement. As such, their assignment was the exercise of a judicial function, so they enjoy absolute judicial immunity.

1      The primary reason for absolute judicial immunity from civil actions is "not . . . the

2  protection or benefit of a malicious or corrupt judge, but . . . the benefit of the public, whose

3  interest it is that the judges should be at liberty to exercise their functions with

4  independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554 (1967)

5  (citations and internal quotation marks omitted). Although this absolute immunity can be

6  lost in two situations,[11] nothing in Plaintiff's Amended Complaint suggests either is present

7  here. Accordingly, Hearing Officers Harold Merkow and Doug Jorden have absolute

8  judicial immunity with respect to the claims arising from Plaintiff's Abatement appeals,

9  and the Court will dismiss the claims against them without leave to amend.

10      **G.    Count 7 – *Monell* Liability**

11      Plaintiff next brings a *Monell* claim against the City. In *Monell*, the Supreme Court

12  held that a municipality is not liable for § 1983 claims under a theory of *respondeat*

13  *superior*. 436 U.S. at 694. Instead, a plaintiff must show that the municipality has adopted

14  an "official policy" or "custom" that caused the alleged constitutional violation, "whether

15  made by its lawmakers or by those whose edicts or acts may fairly be said to represent

16  official policy." *Id.* "The 'official policy' requirement was intended to distinguish acts of

17  the *municipality* from acts of *employees* of the municipality and thereby make clear that

18  municipal liability is limited to actions for which the municipality is actually responsible."

19  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (quoting *Monell*, 436 U.S. at 694).

20  A *Monell* claim for municipal liability can be based on (1) a municipality's official written

21  policies, *id.* at 480, (2) a "widespread practice that, although not authorized by written law

22  or express municipal policy is so permanent and well settled as to constitute a custom or

23  usage with the force of law," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)

24  (internal quotation marks and citations omitted), or (3) decisions by a person with "final

25  policy-making authority," *id.* at 123.

26  . . .

---

27  [11] The two situations where absolute judicial immunity can be lost are when the judge was
28  performing a "non-judicial action" or when the judge was acting "in clear absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991); *Stump*, 435 U.S. at 356–57. There are no facts in the Amended Complaint to suggest either of these scenarios.

Here, Plaintiff has not alleged any non-conclusory facts raising the plausible inference that the City's Ordinance is unconstitutional or that the City has an official policy or practice that violates his constitutional rights. The Court will thus dismiss Plaintiff's *Monell* liability claim, and because the Court finds Plaintiff cannot cure the defects in this claim, Count 7 is dismissed without leave to amend.

### Count 8 – Conspiracy to Violate Constitutional Rights

Finally, Plaintiff alleges Defendants entered into an agreement and acted in coordination to deprive Plaintiff of his constitutional rights. (Am. Compl. at 95–97 ¶¶ 305–14; *see also* Resp. at 9:18–24.) "To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights." *Mendocino Env't Ctr.*, 192 F.3d at 1301 (quotation cleaned up).

Here, Plaintiff has—if barely—alleged sufficient facts to show that Faust, Lozier, Egger, Hannah, and Edwards acted in concert to violate his procedural due process rights, and the Court will, at this early stage of the litigation, infer an intent or meeting of the minds on the part of these Defendants to violate Plaintiff's procedural due process rights. (*See* Am. Compl. ¶ 307 (alleging Defendants worked in concert to "[t]arget Plaintiff for enforcement shortly after he refused to sell his land").) As discussed above, Plaintiff alleges that Faust contacted him repeatedly to discuss the City's interest in buying Plaintiff's Parcels, and he together with Lozier, Egger, Hannah, and Edwards also participated in bringing and resolving the Code enforcement actions on the Parcels, (*e.g.*, Am. Compl. ¶¶ 58, 60, 67, 71, 89, 92–93, 183; Am. Compl. at 83 ¶ 238). The allegations as a whole raise the plausible inference that these Defendants acted in concert in a biased or interested manner in their participation of the resolution of the abatement actions in violation of the Due Process Clause. As such, the Court will allow Plaintiff's conspiracy claim to proceed against these five Defendants with respect to Plaintiff's procedural due process claim, and the Court will dismiss the claim in all other respects without leave to amend.

**IT IS THEREFORE ORDERED** granting in part and denying in part Defendants' Motion to Dismiss Amended Complaint (Doc. 36). All claims against Defendants City of

Peoria, Henry Darwin, Douglas Jorden, Harold Merkow, and Amanda Sheridan are dismissed without leave to amend, and those Defendants are terminated. Moreover, Counts 1 through 5, 7, 9, and 10 are dismissed in their entirety without leave to amend. As discussed in this Order, portions of Counts 6.1 and 6.2, in which Plaintiff brings a § 1983 claim for procedural due process violations under the Fourteenth Amendment, shall proceed only against Defendants Mike Faust, Bob Lozier, Mark Egger, Eric Hannah, and Jon Edwards. Likewise, the conspiracy claim in Count 8 shall proceed against the same Defendants on the same basis.

**IT IS FURTHER ORDERED** that, in the remaining Defendants' Answer, which those Defendants shall file by **January 23, 2026**, they need address only those paragraphs in the Amended Complaint (Doc. 32) pertaining to the remaining claims against them, as stated above, and may disregard the balance of paragraphs in the Amended Complaint that do not pertain to the remaining claims.

**IT IS FURTHER ORDERED** that the Court will set a case management conference under Federal Rule of Civil Procedure 16 by separate Order.

Dated this 18th day of December, 2025.

Honorable John J. Tuchi
United States District Judge

- 29 -